AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. 2:23-mj-136 |
| **Information Associated with Riverside Recovery Services That Is Stored At Premises Controlled by Qualifacts Systems LLC, 315 Deaderick St., Nashville, TN 37238** | ) ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
**See Attachment A.**

located in the _____**Middle**_____ District of _____**Tennessee**_____ , there is now concealed *(identify the person or describe the property to be seized):*
**See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1347 | Health Care Fraud |
| 18 U.S.C. 1035 | False Statements Related to Health Care Matters |

The application is based on these facts:
**See Attached Affidavit**

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ryan Houston, Special Agent- HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___3/6/2023___

Chelsey M. Vascura
United States Magistrate Judge
*Judge's signature*

City and state: Columbus, Ohio

Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

This warrant applies to information associated with Riverside Recovery Services LLC (Riverside) that is stored at premises owned, maintained, controlled, or operated by Qualifacts Systems LLC, a company headquartered at 315 Deaderick St., Nashville, TN  37238.

## ATTACHMENT B – Items to be Seized

**I.        Information to be disclosed by Qualifacts (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including electronic health records, files, schedules, logs, billing documentation, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A for the time period October 1, 2015 through the present:

a. The complete electronic health record for all records associated with the account including information on authorship associated with the record, and the date and time at which each record was created and edited.

b. All records or other information regarding the identification of the account users; such as full user name, user identification, access logs, and audit logs.

c. The types of services utilized and service agreements.

d. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

e. All records pertaining to the electronic scheduling of the individuals associated with the Provider, to include such information as; daily schedules (patient appointments) for each Riverside provider, access logs identifying who created the schedules, audit logs associated with any edits or alterations to the schedules, and any other information/documentation pertaining to the creation and/or editing of the schedules.

    f.   Data of claims and billing related to the account, including electronic transmission of patient billing, superbills, procedure/diagnosis codes, patient information, schedules, other relevant medical billing data, CMS 1500 or UB04 forms, charges, payments, all claim images, and attachments stored in the Provider's EMR system.

## II.    Information to be seized by the government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. § 1035 (False Statements Relating to Health Care Matters) and 18 U.S.C. § 1347 (Health Care Fraud) that involve Riverside Recovery Services (Riverside), Riverside owner Amy Smart (Smart), and employees of Riverside, known and unknown, occurring between October 1, 2015 and the present, including, but not limited to, for each account or identifier listed in Attachment A, information pertaining to the following matters:

    a.    Electronic health records of Riverside.

    b.    Billing records of claims submitted by Riverside.

    c.    Scheduling records of Riverside.

    d.    Correspondence with Riverside and its representatives.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
RIVERSIDE RECOVERY SERVICES
THAT IS STORED AT PREMISES
CONTROLLED BY QUALIFACTS
SYSTEMS, LLC, 315 DEADERICK ST.,
NASHVILLE, TN 37238

Case No. __2:23-mj-136__

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Ryan Houston, Special Agent with the United States Department of Health & Human

Services, Office of Inspector General, Office of Investigations (HHS-OIG-OI), being first duly

sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.        I make this affidavit in support of an application for a search warrant for

information associated with a certain account that is stored at premises owned, maintained,

controlled, or operated by Qualifacts Systems, LLC (Qualifacts)**,** a cloud-based electronic health

records (EHR) provider headquartered at 315 Deaderick St., Nashville, TN 37238. The

information to be searched is described in the following paragraphs and in Attachment A. This

affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a),

2703(b)(1)(A) and 2703(c)(1)(A) to require Qualifacts to disclose to the government records and

other information in its possession pertaining to the subscriber or customer associated with the

accounts, including the contents of communications.

2.        I am a Special Agent employed by the United States Department of Health and

Human Services (HHS), Office of Inspector General (OIG), Office of Investigations (OI).  I have

been so employed since January 2011. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.      As part of my duties I am authorized to conduct investigations, audits and inspections in connection with the administration and enforcement of laws, regulations, orders, contracts and programs in which the U.S. Department of Health and Human Services (HHS) is, or may be, a party of interest, and perform other duties on behalf of the Secretary of the Department of Health and Human Services. My chief responsibility is the investigation of fraud involving Federal Health Care Programs. As a Special Agent with the HHS-OIG-OI, I have received basic criminal investigator training as well as specialized training in the investigation of fraud and financial crime. Previously, I was employed as a Special Agent with the Ohio Attorney General's Office, Medicaid Fraud Control Unit (MFCU) for seven (7) years. My primary responsibility during this nineteen (19) year period has been the investigation of criminal fraud against the health care programs commonly known as Medicare and Medicaid.

4.      The facts in this affidavit come from my participation in the investigation, from information provided to me by other federal and state agents involved in this investigation, and from witnesses. This affidavit intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1035 (False Statements Relating to Health Care Matters) and 18 U.S.C. § 1347 (Health Care Fraud) have been committed by Riverside Recovery Services, LLC (Riverside), Amy Smart (Smart), and others. There is also

2

probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

**Medical Benefit Programs**

6.     Riverside has provided medical services to recipients of Medicaid and other healthcare benefit programs as that term is defined in Section 24(b) of Title 18, United States Code.

7.     Section 24(b) of Title 18, United States Code, defines a "healthcare benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

8.     Specifically, Medicaid is a federal health care benefit program designed to provide medical services, equipment, and supplies to certain individuals and families with low income pursuant to the Social Security Act (Title 42, United States Code, Section 1396, et seq.).  Medicaid is a health care benefit program as defined in 18 U.S.C. § 24(b).  Approximately 60% of the funding for the Ohio Medicaid program is supplied by HHS.  The Ohio Medicaid program is administered by the State of Ohio, through the Ohio Department of Medicaid (ODM).

9.     As part of the federally approved state plan, ODM has elected to contract with Medicaid Managed Care Organizations (MCOs) through contracts known as Contractor Risk Agreements (CRAs), which must conform to the requirements of 42 U.S.C. §§1395mm and §1396b(m), along with any related federal rules and regulations. 42 U.S. Code § 1396u-2. MCOs are health insurance companies that provide coordinated health care to Medicaid recipients.  The MCOs contract directly with healthcare providers, including hospitals, doctors, and other health

care providers to coordinate care and provide the health care services for Medicaid recipients. Providers who contract with an MCO, are known as Participating Providers. These providers likewise must enter into a "provider agreement" with the MCO in which the Participating Provider agrees to comply with all applicable state and federal statutes, regulations and guidelines. Participating Providers are assigned a unique provider identification number, which is necessary to be eligible to bill and receive reimbursement for services rendered to Medicaid recipients. As part of the Ohio Medicaid Program, Medicaid MCOs and the Participating Providers must furnish medical and health-related services pursuant to the state plan. Pursuant to the CRAs, ODM distributes the combined state and federal Medicaid funding to the MCOs, which then pay Participating Providers for treatment of Medicaid recipients. As the administrator of the Ohio Medicaid Program, ODM must track all services received by recipients, whether enrolled directly with ODM or enrolled with a MCO. Therefore, Medicaid MCOs are required to submit to ODM encounter data, which includes detailed records of the services a Medicaid recipient received from a Participating Provider.

10.    ODM pays Medicaid claims submitted to it by valid Medicaid providers.

11.    A participating Medicaid provider is a person or business who agrees to (1) provide the service, (2) submit the claim, and (3) accept as payment in full the amount paid by the Ohio Medicaid program. The provider signs a Medicaid participation agreement, which requires them to keep records necessary to fully disclose the services provided to Medicaid patients. To receive Medicaid reimbursement for covered services, the provider electronically submits billing data to ODM, which pays the provider either by mail or electronic transfer.

12.    Medicaid pays participating health care providers on the basis of reasonable charges for covered services provided to beneficiaries. They assign to each provider a unique billing

4

Provider Identification Number (PIN). Providers agree to know Medicaid reimbursement policies, which are communicated via regulations, manuals and newsletters.

13.     Medicaid providers agree to bill only for services actually rendered that are medically necessary to diagnose and treat illness or injury and for which the provider maintains adequate documentation. Medicaid currently requires health care providers to retain records of services for six (6) years from the date of payment for such services.

14.     Pursuant to Ohio Administrative Code Sections 5160-1-01(a) and (b), medical necessity is defined as: "procedures, items, or services that prevent, diagnose, evaluate, correct, ameliorate, or treat an adverse health condition such as an illness, injury, disease or its symptoms, emotional or behavioral dysfunction, intellectual deficit, cognitive impairment, or developmental disability…." Further, "[c]onditions of medical necessity are met if all the following apply:

> (1) Meets generally accepted standards of medical practice;
> (2) Clinically appropriate in its type, frequency, extent, duration, and delivery setting;
> (3) Appropriate to the adverse health condition for which it is provided and is expected to produce the desired outcome;
> (4) Is the lowest cost alternative that effectively addresses and treats the medical problem;
> (5) Provides unique, essential, and appropriate information if it is used for diagnostic purposes; and
> (6) Not provided primarily for the economic benefit of the provider nor for the convenience of the provider or anyone else other than the recipient."
> O.A.C. §5160-1-01(c).

15.     Submission of a claim to a healthcare benefit program, whether public or private, involves representations by the provider that the services rendered were of a quality that met professionally recognized standards which include: (1) informed consent; (2) were medically necessary; and (3) were supported by documentation of such necessity.

5

## PROBABLE CAUSE

16.     Riverside is a counseling center that provides alcohol and drug counseling and case management services.  Currently, Riverside has two business offices located in Ohio: one in Mount Vernon and one in Coshocton. Outpatient services are reportedly provided at both office locations. Riverside also operates several sober living homes near their counseling offices. The sober living homes are reportedly staffed 24/7 by Riverside employees. The houses are occupied by client reportedly receiving drug treatment counseling and case management form Riverside.

17.     According to Ohio Secretary of State records, the Initial Articles of Incorporation for Riverside (Registration #: 2365352) were filed on 3/1/2015, which listed Travis Owens (Owens) and Amy Smart (Smart) as authorized agents for the business.  In addition, an amended Ohio Secretary of State filing on 5/10/2017 also reflected Owens and Smart listed as co-owners of Riverside.

18.     Ohio Secretary of State records further show that on 3/21/2019 Smart filed an additional Articles of Organization (Registration #: 4309228) for Riverside Recovery LLC.  In this filing, Smart was listed as the sole statutory agent for the business.  Smart included a mailing address of 212 E. Chestnut St., Mt. Vernon, OH  43050 on the filing.

19.     According to Ohio Medicaid records, Riverside signed a Medicaid provider agreement on 10/6/15 and obtained a Medicaid billing number effective 9/18/15. The individual who signed the Medicaid provider agreement was listed as Owens who identified himself as 100% owner. A revalidation of Riverside's Medicaid provider agreement on 9/1/2020 listed Owens and Smart each as 50% co-owners of the business.

6

**Ohio Medicaid Billing**

20.     Riverside began submitting claims for reimbursement to the Ohio Medicaid program beginning with the first date of service 10/1/2015.

21.     From 1/1/2018 through June 30, 2022, Riverside billed a total 534,296 claims and were paid $34,658,805.88 by Ohio Medicaid and Ohio Managed Care Plans. The top billed procedure codes by Riverside during the same time frame are as follows:

- Alcohol and/or drug services; case management (H0006) : $11,640,042.25 paid

- Alcohol/drug svc-intensive outpatient program (H0015) : $15,104,956.51

- Alcohol/drug services-group counsel by clinician (H0005) : $1,440,654.17

- ALC/ drug testing, collection & handling (H0048) : $609,655.84

- Psychotherapy w/ patient 30 mins (90832) : $553,703.51

- Psychotherapy w/ patient 60 mins (90837) : $3,230,038.73

**Investigation**

22.     On 8/13/18, the Ohio Attorney General's Office – Medicaid Fraud Control Unit received an allegation from a previous patient and previous employee of Riverside, S.C., who was a patient of Riverside from October 2015 through April 2017. After completing the program, S.C. was hired by Riverside and worked as a chemical dependency counselor assistant (CDCA) at Riverside from May 2017 until August 2018. S.C. alleged Riverside billed for case management and counseling services they did not provide to her while she was a patient. In addition, S.C. alleged she was instructed to bill for services not rendered while she working as a CDCA.

7

23. When interviewed, S.C. stated Amy Smart (Smart), who S.C. believed was the owner of Riverside, was her assigned counselor. Smart obtained her CDCA license on 10/22/14. After reviewing a summary of the claims billed by Riverside under her Medicaid recipient number provided to S.C. by agents, S.C. identified services that were billed, but not rendered. S.C. recalled meeting with Smart approximately five (5) times for a one-on-one counseling session from 10/13/15 through 4/29/17. According to a review of Ohio Medicaid billing records, Riverside billed for behavioral health counseling & treatment per 15 min (H0004) on 64 dates of service for S.C.. Furthermore, S.C. alleged she never received case management services or transportation while she was a patient at Riverside and could not recall any services provided by Riverside that would have been considered case management. Medicaid billing records again however showed Riverside billed for alcohol and drug case management (H0006) on 96 dates of services.

24. While working for Riverside, S.C. reported she was transporting patients to various appointments and documenting the transport as case management. S.C. said Shannon Ellis (Ellis) was her Supervising Counselor. S.C. was told by Ellis that she could not document transportation on her case management notes. S.C. alleged she would be required to bill case management services for each patient she had in her vehicle. S.C. alleged there was no case management occurring during the transport.

8

25.    On 8/6/20, agents interviewed K.D.. K.D. began working as the night monitor at Riverside's women's sober living house in Mount Vernon in October 2017. K.D. stated Bobbi Milbrandt (Milbrandt) was the house supervisor at the time, but was later promoted to clinical supervisor. K.D. was promoted from night monitor to case manager after several months. K.D. said her primary role as a case manager was to transport client to and from various appointments. Riverside had two (2) vans available for staff to use as transportation. K.D. alleged she billed for case management and counseling services that she did not provide at the direction of Smart and Milbrandt. K.D. reported she was told by Milbrandt and Smart to bill case management and group counseling for clients that did not show up for group who were either out of the house on a "24-hour pass" issued by Smart or were out doing community service. K.D. named Riverside clients M.E., C.D., H.R., T.T, and T.L. as client in which she submitted billings and notes for in which she did not provide. K.D. reported she referred to a list of note templates provided by Milbrandt and Smart. K.D. was reportedly instructed by Milbrandt and Smart to copy and paste the pre-written notes for billing purposes. Agents then reviewed Medicaid claims billing data and found claims submitted by Riverside for these named clients.

26.     On 8/14/20, agents interviewed P.A., another previous employee of Riverside. P.A. began working at Riverside in August 2017 in the women's sober living home in Mount Vernon. P.A.'s duties were providing case management and counseling services to women living in the home. P.A. alleged she was instructed by her supervising counselor, Milbrandt, to bill for clients who did not attend group counseling sessions. P.A. stated clients would appear on her schedule as if they were in her group counseling session when they were absent. P.A. said the schedule was used for billing purposes. Riverside clients residing in the home were occasionally issued a verbal "24-hour pass" by Smart. A client who received a 24-hour pass could leave the house for the full 24-hour day. P.A. alleged she was instructed to bill group counseling sessions for client who were not in the counseling session and out of the house on a 24-hour pass. P.A. also transported women living in the sober home to and from various appointments. She drove a van owned by Riverside. The van would often times be full. P.A. alleged transportation was being billed as case management for each client in the van. P.A. believed case management was being billed because she overheard conversations between Milbrandt and Smart that indicated it was. P.A. filled out a mileage log that was located in the van to track all of the transports.

27.     On 8/18/20, agents interviewed A.S., a previous employee of Riverside. A.S. began working as a case manager at the women's sober living home in Mount Vernon in March 2017. A.S. alleged she was instructed by her supervising counselor, Milbrandt, that transportation could not be billed as case management. A.S. said she was given a set of template case management notes that she was to use in place of documenting transportation. A.S. said the van she used to transport clients was generally full, and she did not provide individual case management to each client in the van, yet it was documented and billed as if she did. A.S. alleged she was verbally told by Milbrandt and Smart on several occasions to bill for case management and group counseling sessions that she did not provide. This generally occurred when clients were not present for group counseling sessions while being on a 24-hour pass. Milbrandt also reportedly instructed A.S. to bill for a crisis intervention counseling session even if there was no crisis. Crisis counseling sessions are reimbursed at a higher rate by Medicaid, so Milbrandt instructed her to "make one up" if a crisis situation did not occur. Milbrandt instructed A.S. to bill for case management even if no services were provided to the client.

11

28.     On 8/14/20, agents interviewed M.C., a former employee of Riverside. In April 2018, M.C. was hired to work as the house manager at the women's sober living house in Mount Vernon. M.C. was supervised by Milbrandt and Smart. M.C.'s main job duty was to oversee the daily functions of the house. M.C. said she was directed by Smart and Milbrandt to bill for case management services she did not provide. Riverside provided two (2) vans for employee use in order to transport clients to and from appointments. M.C. named "Doug" LNU (Doug) as a driver for Riverside. M.C. alleged at the direction of Milbrandt and Smart, she created case management notes and billed for case management services for clients who were transported to and from appointment by Doug. M.C. stated no case management was provided during the transport. M.C. alleged she was also instructed to bill and document that she reviewed the results of urine drug screens with clients. M.C. reported although she did not discuss the results of the urine drug screen with the client, she documented it as if she did.

29.     On 10/21/2021, agents interviewed AS2, a current employee who reportedly was demoted from Clinical Supervisor around August 2021 after he began questioning Riverside's billing practices. According to AS2, Smart instructed staff to separately bill for 15-30 minutes of case management services for reviewing urine drug screen results with the client even though these discussions occurred during the client's one-on-one counseling session, which was already being billed. AS2 stated when he told Smart that Riverside could not bill that as a separate service, Smart reportedly argued, "That's 15-20 hours of revenue if we do it like that." AS2 believed Smart only cares about profits.

30.     On 5/13/2021, agents also interviewed T.C., a former licensed chemical dependency counselor for Riverside, who was reportedly terminated after meeting with agents. T.C. alleged Smart directed Riverside staff to bill the maximum allotted number of hours for each client despite the fact staff was not actually performing these services. T.C. provided agents with a copy of an email from Smart which was sent on 8/27/2019 from email address rrservice15@gmail.com, which stated, in part, "…we will be reviewing the billing requirements of 30 each week of full time staff. Any staff not billing their required 30 hours need to begin doing so immediately. Effective today, all Managers and Assistant Managers will be required to bill at minimum 20 hours per week."

31.     T.C. also provided agents with an email from Smart, dated 7/30/2020, sent from rrservices15@gmail.com, which stated, in part, "…we became aware that 2.5 clients can have additional billed services. Bobbi (Milbrandt) and I are also aware that currently we are short on service providers in our 2.5 houses right now.  She and I will begin billing an additional 30 min per day for each client in the 2.5 LOC houses.  When we increase our staff, we will turn that billing back over to the houses to provide." T.C. argued Smart never worked a shift at any of the houses and stated Smart and Milbrandt billed for services they did not actually provide.

32.     Finally, T.C. claimed that in April 2021 she discovered Riverside was still billing for services for client D.T., despite the fact D.T. left Riverside in January 2021.  T.C. explained D.T. had previously been a client at the Mt. Vernon location.  T.C. alleged when Smart opened the Coshocton office, Riverside continued to bill for services for D.T. at the new location.  A review of Medicaid billing records confirmed Riverside billed for services for D.T. through 4/1/2021.

33.     On 1/12/2023, agents spoke with Milbrandt, who confirmed Riverside routinely billed for services not rendered and fabricated notes in support the Medicaid billings. Milbrandt explained this applied to numerous services which Riverside billed, including group counseling, as well as the practice of billing for transportation as case management.

34.     Milbrandt stated Smart was the boss at Riverside and ordered her and others to create notes for services that didn't occur oftentimes using approved templates Riverside provided to staff. Milbrandt added Smart herself also created and submitted the fabricated notes.

35.     Furthermore, Milbrandt stated after she left Riverside's employment around October 2020, Riverside continued to fraudulently bill using her provider number because they could bill for services at a higher rate using her number due to her education/certification level. During the interview, Milbrandt provided agents with several documents and emails in support of her statements.

36.     On 2/28/2023, agents spoke with M.M., who is a current resident at a Riverside sober home. According to M.M., she and other residents at the sober home were forced to take turns babysitting the children of Riverside outpatient clients while the outpatient clients attended group counseling. She explained that since the outpatient group counseling took place at the same time as the residential group counseling, the sober home residential clients were conducting the babysitting services instead of attending group counseling. M.M. believed Riverside, however, was still billing for group counseling, as if she attended.

37.     A review of Medicaid billing records confirmed Riverside has billed Medicaid for services allegedly provided to M.M. as a Riverside client. Medicaid billing data reflected Riverside was paid approximately $26,000 for services from 6/24/2022-12/24/2022.

14

38.     Accordingly, based on the foregoing, there is probable cause to believe that individuals at Riverside, including Smart, have submitted fraudulent claims to Medicaid. Consequently, there is probable cause to believe that violations of 18 U.S.C. § 1035 (False Statements relating to Health Care Matters) and 18 U.S.C. § 1347 (Health Care Fraud) have been committed by individuals at Riverside, including Smart, and that evidence related to such violations may be found with Riverside's EHR, further described in Attachment A. Accordingly, this affidavit and application for search warrant seeks authorization to search the computer accounts and/or files further described in Attachment A, following the procedures described herein and in Attachment B.

## BACKGROUND CONCERNING ELECTRONIC HEALTH RECORDS

39.     In general, an electronic health record (EHR) is a digital version of a patient's paper medical chart, which can include, inter alia, prescription information, medical services and tests provided, the medical provider rendering the services, and the billing information. Companies, such as Qualifacts, provide healthcare providers access to EHR software.

40.     Qualifacts is a web-based electronic health record (EHR) system designed specifically for behavioral health and human services organizations. Qualifacts offers various services, including, but not necessarily limited to: maintaining EHR and software programs for: scheduling, intake, treatment planning, service documentation, consumer engagement, billing and reporting. Clients obtain an account by signing on and paying for the services with Qualifacts. During the registration process, Qualifacts asks the subscriber businesses to provide basic personal information. Therefore, Qualifacts is likely to maintain stored electronic communications (including retrieved and non-retrieved messages for Qualifacts clients) and information concerning

15

clients and their use of Qualifacts services, such as account access information, and account application information.

41.     When the client creates an EHR, the EHR is transferred via the Internet to Qualifacts's servers, and then transmitted to its end destination. Qualifacts often saves the EHR on its computer servers. Unless the sender of the message specifically deletes the message from the Qualifacts's server, the message may remain on the system indefinitely. Even if the sender deletes the message, it may continue to be available on Qualifacts's servers for a certain time period.

42.     A transmitted EHR typically includes the content of the record, the date and time at which the EHR was sent, and the size and length of the EHR.

43.     EHR providers in general, like Qualifacts, ask their subscribers to provide certain personal identifying information when registering for their services. This information can include the subscriber's name, physical address, telephone number(s) and other identifiers, e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

44.     EHR providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of use times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because some devices that connect to the Internet must use an IP

16

address, IP address information can help to identity which computers or other devices were used to access the EHR account.

45.     In some cases, subscribers will communicate directly with their EHR providers about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  EHR providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

46.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Qualifacts to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

47.     Based on the forgoing, I request that the Court issue the proposed search warrant.

48.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

17

49.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Ryan Houston
Special Agent
U.S. Department of Health & Human Services
Office of Inspector General
Office of Investigations

Subscribed and sworn to before me on this _____6th_____ day of March 2023.

UNITED STATES MAGISTRATE JUDGE

18